Then we'll call the case of Aaron McLean v. Amy McLean 525-0094. Counsel. All right. But those reports, though, varied pretty significantly from A to B to C. Would you agree? Not greatly significantly. There were changes over time. But what happened was the initial report was done, and she was the court-appointed expert. She was the court's witness. She's the only independent witness. Understood. But if the court has an independent witness, or any witness, frankly, that they're relying on, and that witness has varying recommendations over time, which one is the court supposed to take? They evolved over time, Your Honor. Okay. What happened was the initial report was done, and then the parties asked Dr. Pleasant. She didn't start this. They asked her to reconsider based on new information. And so she did new interviews and came up with the first addendum. Then they asked her again to do another addendum, which she did on the eve of trial. So that's the most current evolution of her report is what's contained in the second addendum. And we have included, because of the importance of this report, we've included in our appendix. So you can see it without leaving the brief. You can look at it. And if you look at that report, it's hard to imagine a more thorough and comprehensive report. And she interviewed people over and over. She was criticized for not interviewing Aaron in the last addendum, but that's because he didn't want to. She asked, and he said, no, thank you. She interviewed everybody that needed to be interviewed. And I think when you read that report in its entirety, you can't take individual pieces out and criticize them, I think. You have to read that report in its entirety and as an evolution. She was trying to find a ground. And at times, earlier in the report, for example, she suggested – But I'm going to take issue with you, Mr. Kanker, because I've read the report and I've read the transcript of the trial. And there were many times where context mattered in relationship to her analysis in that report. Would you agree? Yes, Your Honor. Context of text messages, and there were text messages provided before that weren't included completely in her report. Would you agree with that? There was context in terms of the exchanges. Well, I'm not sure if I understand what – Well, I mean, I believe that there were – and I don't have the exact spot to the record or the transcript, but I believe that Mr. Courtney cross-examined her a number of times about reference to what she meant by her analysis of certain exchanges and text messages. And he expanded the scope of the text messages and the discussion. And sometimes when we expand those discussions, it includes more nuances and clarity. Would you agree? I suppose it does, Your Honor. All right. So we have to look at the transcript in relationship with the report. Would you agree with that? Oh, yes, yes. Okay, thank you. Absolutely, yes. And that's one of our points. If they had questions about the report, they had the opportunity to examine her at trial, and I think the Court will see that she answered those questions, and those questions do not detract – her answers to those questions do not detract from the overall value of her report. I think we have to read the report as a whole and in light of her examination at trial. I think the important thing is the trial court ignored her report, basically. And – but the trial court – But they referenced her report in their order, though, correct?  All right. And they discussed her report in detail in their order. Is that correct? Well, it's discussed in the order. And in the analysis. Yes. All right. But it rejected her recommendations. And I think the trial court, if it had concerns, it was a course witness. She had the opportunity to ask her questions at the trial. She declined to do that. Dr. Pleasant – this is about the children. You know, the interaction of the parties is one thing, but we're talking about their ability to make decisions. We're talking about the allocation of parenting time. It's all about the children. Not so much about the interaction of the parents, but it's about the children. Dr. Pleasant's report focuses on the children and the best interests of the children. If you look at her summaries and recommendations, they're all about the children and the psychological interests of the children. It would be hard to find a better qualified expert. She's a clinical psychologist with a doctorate and over 20 years of practice experience. So the court, I think, simply didn't give proper weight to the overall conclusions and particularly the last conclusions of Dr. Pleasant. Earlier on, she thought that there could be some joint decision-making. By the end and the addendum, after reviewing the current situation, she said, I don't think that's possible. I think the time will come. You know, these are good parents. Before the separation, they were able to make joint decisions. The court says optimistically, I think that the time will come when they can, going forward, they'll be able to make joint decisions. But that's not the current situation. The court has to make that decision based on the current situation. And we have to focus on exactly what the issue is. It's joint decision-making is one thing. And so she went back to her earlier recommendation that Amy be given decision-making, primary decision-making, but, of course, under Amy's proposed order, she agreed to consult with Aaron on the important decisions. You may say, well, that's overly optimistic, but he would not be entirely excluded from the decision-making process under her proposed order. But I think the record shows, we have to just go with the record, the record shows that the parties are simply incapable of making reasonable joint decisions on these significant matters. That's the first factor. The second factor as to parenting time, there was an agreed order. They tried to mediate that issue. There was an agreed order on parenting time in January of 2023. And they followed that order as best they could. They did some modification, agreed modifications, but they tried to follow that order. And then at trial, in their submissions, Aaron asked for an extension, asked that his time be extended until Wednesday. Dr. Pleasant said this is not good, to have the children away from their primary residence during school time, during school. But she said this could be modified in the summer. At one point she also said that she thought that it could be allocated so that Amy would have primary decision-making for the girls and Aaron would have it for the boys because of the different relationship there. I don't want to cut short your time on the parenting issue, but I was a judge for about 23 years. I don't know how many times an attorney appeared in front of me and said I went to law school because I was told there would be no math. And my dad was a math teacher, but I still struggled with the math part of it. A big part of your brief also talks about the finances. Can you discuss why the Hunt case does or does not apply? We should not consider the Hunt case. And also the $54,000, why that was. I do want to cut short your discussion. No, I agree. Just as long, I'd like to hear more argument on the math. And also the $54,800. Yes, yes, Your Honor. These are difficult to discuss at oral argument because they're number crunching, but I'll do my best. The AT&TC's account has four components, four parts. And this was not taken into account properly in the trial court. The first, and this is not a pension. That's the very important part. The Hunt case applies to pensions and similar accounts where the actual value cannot be presently determined because there are future contingencies. The person with the pension may keep working. It may or may not vest. You know, there are all these contingencies. The Hunt formula works for that. And we agree the Hunt formula should be applied to his pension, his AT&T pension. The four components of this are. And I'm sorry to interrupt you. Can you describe what type of account it was? Was it a profit-sharing account? It's really a 401K. But it's not labeled as such. No, it's not labeled, but Aaron testified. In his testimony, he said it's a 401K. I guess he would know. But it basically is just an account. It's like a mutual fund. It's an account that had stocks, bonds, and other financial investments. It's not a pension. It's not contingent on anything. Really, it's closed. It was a closed account. He's no longer employed by AT&T, so nothing more will be added to it. There are four parts to it. And it's part marital and part non-marital because his AT&T employment predated the marriage and then extended past the marriage date. So part of it, 44%, was before the marriage, 56% after the marriage. And so the part of that account, $28,000, that was there at the date of the marriage, we agree that's his non-marital property. That's his property. Then there was a pension. When his employment with AT&T ended, I don't know how it ended, but when it ended, instead of taking his pension, he took his pension as a lump sum and rolled it into this account. He just transferred it over. So almost $275,000 was put into this account from his pension. We agree the Hunt formula should apply to that because you can't really determine what part of it is pre-marriage and what part is marriage because different amounts and there's no formula for determining that. So the Hunt formula applies to that. But as to the amount that contributed after the marriage, $168,000, and the earnings in that account, which there's no specific figure in the record, but it was over $400,000 apparently. So your calculation then would in fact not allow him any earnings on his non-marital portion. You're treating all earnings, all of the earnings throughout the year as marital, correct? Right. On his non-marital portion, am I correct? Right. No. The earnings post-marriage, of course, would be marital property. Oh, sorry. The interest, would it? Right. Let me define that correctly. Any earnings in the account in terms of growth on the stocks and such, you're suggesting in your formula that his non-marital portion be fixed in time and that any growth would then be deemed marital. Is that correct? That's right, Your Honor, because that's the statute. That's exactly what the statute says. Where does it say that in the statute? I'll have to research that, Your Honor, and I'll come back to it. But the statute says that if you have a blended account like this, then it's his burden, by clear and convincing evidence, to show what part of the post-marriage earnings are attributable to his non-marital property or to his premarital property and what part are not. And the statute says that if you can't do that, it's all marital property. That's why that argument is the right argument. The MasterCard account is very simple. It's all marital property. It's all post-marriage, and anything you put in there is marital property, and to pull out $54,000 doesn't make sense. It's apples and oranges. First, he paid temporary maintenance and child support. So what? That has nothing to do with the balance in the MasterCard account. They're completely unrelated. So that entire MasterCard account — The judge found that that was a non-mandatory contribution, correct? Yes, but — It was a discretionary contribution. That's right, but — What is a discretionary? I'm sorry. The 401k contribution — The MasterCard contribution. That MasterCard contribution, do you agree that the court found that that was, in fact, a discretionary contribution? Yes, it was all discretionary. But he could have done — it was still — Which means if it's discretionary, then it can be used in terms of calculating child support and maintenance, but it is still a marital asset, correct? Correct. All right. Correct. Because if it were mandatory, then it would be a different calculation entirely for maintenance and support. Yes, but — Would you agree? Yes, but — Okay. It was his earnings, which is marital property, right? Post-marriage earnings. He could have spent it on anything. You know, he could have done anything with it. He chose to save it. But by saving it, does that transfer it into non-marital property? No. It's still marital property. Everything you put in that account — And if I recall, the child court awarded each one of them their bank accounts. Is that correct? Yes. Because they're still an individual property. Yes. Regardless. So whatever they were saving, it was theirs. Yes. Correct? Okay. Thank you. I see my time is up. I have no other questions. I have an additional question, if that will help. With regards going back to the AT&T plan, I went through the hundred-and-something exhibits plus. There was a statement, if I'm not mistaken, for every year of the marriage. Am I correct? Was there a statement that showed all of the contributions that were made to that account?  During the course of the marriage? The AT&T account, yes. All right. And also, was there not in each one of those statements, wasn't there the growth? It talked about the annual growth, whether it be one year, I think it was 14 percent, and one year it was negative 19 percent. Would you agree? It may have been there, but that would be an annual summary. It wouldn't show the changes over time. But Erin was asked during the exhibit. Hold on. I haven't asked the question yet. You have however many years from the date of marriage until the date of trial. You have all of those cumulative statements, correct, with all of the information, with his contributions, the match, the growth rate. Couldn't you provide an expert? Couldn't one of the parties have provided an expert to the dollar? I suppose they could, but it was his burden. It was his burden to do that under the statute. I'll get you the citation for that, Your Honor. But it was his burden to show what part of the earnings in that account are attributable to the $28,000 that was deposited or that was in the account of the date of marriage. He had to do that. It was up to him to take those figures and maybe needing an expert to do it, but come up with a figure to give to the trial court to say these are my non-marital earnings. I'm having a hard time reconciling that because it's the trial court's job to determine the value of assets based on the evidence that is presented at the trial. And if a trial judge has evidence from one party this and another party that, they don't get to pick a C. They get to pick A or B. So when you say it was his burden, wasn't it also her burden to present an accurate valuation? No, Your Honor, it was his burden because of the statute. You're going to have to show me the citation. No, because of the statute. The statute, I mean, we have to go by the statute. Well, he's the one making the claim that it's non-marital property. No, no, not at all. It should have been divided. I'm sorry. What is his claim as to the AT&T account? What is his claim as to the AT&T account? Well, the Hunt formula should apply. That's what you're claiming. No, we're saying it should only apply to the pension. He said it should apply to the entire post-marriage part of the account, and that's essentially what the trial court did. So he wound up with two-and-a-half times more than he should have received under the proper calculation. We've done all the calculations as best we can in our brief. Okay. Do you have any other questions? No questions. No questions. Okay. Thank you. Your time is up, but you'll get some time in rebuttal. Thank you. And maybe you can find that statute for justice. I certainly will. Thank you. I certainly will. Thank you. Okay. Mr. Courtney. Good afternoon. Mr. Courtney, please state your name for the record. Charles Courtney. I represent Aaron McClain. Why don't you start with, instead of going through the best interest, why don't you help us with your version of the AT&T account? Sure, Judge. I think the statute the counsel is referring to is dealing with the burden of tracing. He's talking about 503C. Burden of tracing. Marital or non-marital. I think that's what he's referencing. That's 503C. The statute was amended, and that's Section 503A-6. And what it says specifically, and this was new in the law. We always, I think, as practitioners, knew this, but this was the first time I'm aware the legislature agreed. Everything in Illinois is either marital or non-marital property. It's a unitary property state except retirement accounts. And they actually amended the statute, I think in 17, to say that property acquired before marriage is non-marital, except as it relates to retirement plans, which may have both marital and non-marital characteristics. We cited the Phillips case to the court to talk about tracing, if the court got to the issue of tracing. I don't think the court gets to the issue of tracing, but if you do, the burden as suggested by Amy's brief is incorrect. What counsel is suggesting is that a new asset has been created. And if a new asset is created, then the burden shifts on the issue of tracing. The Phillips case dealt with exactly the AT&T savings plan. It's the exact same plan before the court here today. And what the appellate court said was, this isn't a new asset. This was a non-marital account that existed prior to marriage. Husband made marital contributions, in that case wife, made marital contributions into the account. But it did not change the nature of the account. The account remained non-marital. At the end of the day, it didn't really matter because they used the Hunt formula to proportion the account anyway. But there was an addition of $274,957.77. That's marriage. It was the same as the AT&T underlying. Was it marital or non-marital? I think it's non-marital subject to contribution. But under 503A6, it's both. It's marital and non-marital, which is why the Hunt formula is important because the Hunt formula doesn't tell us the dollar value of anything. The Hunt formula tells us the proportions of marital to non-marital when you've got an asset that was earned prior to marriage, during the marriage, or after the marriage. With the $274,000 and some odd change, was that earned during the marriage or was it earned before the marriage? Both. Okay. Both. So the Hunt formula should apply to that amount? Yes, ma'am. Absolutely. And our position is 44%, 56%. Yes, ma'am. And that is the same proportion that we asked the trial court to apply to the entirety of the AT&T savings plan because the savings plans, the dates of contribution to the savings plans, were identical to the pension plan. They started in February of 91 until his date of termination. He was terminated during the trial. They did a reduction in force. So he had substantial time prior to the marriage, during the marriage, and that's where that $274,000 came from, and it's also where the AT&T savings plan came from. They're basically the same periods of contribution. But as of the date of trial, the account was $883,000 and some odd. Correct. So what do we do with the difference between the $28,000 and the 56% of the $274,000? I don't think you do anything with the difference. In effect, what happened is the $275,000 became part of the AT&T savings plan. It became that $800,000 number. The apportionment was between marital and non-marital time in both pension plans. That's where the 44% comes from. I don't think you do anything with that. I think it's a straight math calculation. You apply that percentage to the entirety of the account, and that's the marital share. I think that's what the judge did, and I think that's what you would do. The issue that Judge Scholar raised, and you're correct, I've had cases where I've had every statement for the length of the plan contribution. I know what the return rate is, and I can look year to year, and I can track the growth. I could not do that in this case, and that's why we pointed that out in our brief. These statements, although they have growth figures on them, are very unusual statements as far as pension statements or retirement statements because they have ins and outs out of those accounts. At one point, the account zeroed out for no apparent reason, and then reappears the next year. It's the same account. It never terminated, but that's the paper trail that we were faced with. That's the first problem with that. But the parties agree as to the ultimate value. Absolutely. There's no disagreement that it's $883,727.46. No disagreement at all. The disagreement is how do you apportion that between marital and non-marital interest. Okay. Do you have any other questions on AT&T? The statements that zero out, do you have a reference to those? I do, Judge. It's in my brief. All right. I'll look at the brief here. It is in the brief. It was about 2011, I think, three or four years ago. Because I did not know that it was zeroing out. And it zeroed out and reappears the next month. Okay. Can you address the AT&T? I'm sorry. That's the MasterCard. Okay. Moving on to the MasterCard. MasterCard's fine, sure. MasterCard. You mentioned the $54,000 that the judge deducted. Why that was proper. They say it was improper to deduct that.  Sure. Judge Schor, again, started with this point. It was a discretionary deduction. The entirety of his income, not only his regular pay, but even his bonus pay, which we were required to put aside and divide 50-50, even his bonus pay was included as his income for child support and maintenance. The judge didn't find the $54,000 to be non-merit. There's no reference in the court's order that that's non-merit. It's not. It's 100% merit. It's an issue of the distribution of that asset. Again, the statute was recently amended to allow the court to consider contributions by the parties post-filing up to the date of trial. You're specifically permitted to consider that, and that is, and it's a long site. It's 503-D-2-D-1 and three little I's after it. So that's the site to the statute. So from our point of view and what we argued in the brief is this is a distribution issue. It's a question of why did she do that. So it's not a question of it was improper because she somehow turned it into non-merit property. She didn't. She divided that portion of the merit property other than equally is what she did. When you say see, you're talking about the trial judge.  I'm sorry. Where did she give credit for that to Amy? She didn't. She didn't, Judge. It was a straight out, she awarded those funds to him in the division of the property. Well, in the balancing of equities, doesn't she have to do that? She has to consider the awards to each party. That would include the bonus income that was divided equally that was earned post-separation. All of that was divided equally in her order. That was considered. I think she considered it when she set the maintenance figure and child support figure substantially higher than what they would have been on base pay. They are substantially higher. They were. We don't know that from the record. We don't know that she considered the 54,000. I mean, we don't really know how she balanced the equities. I agree, Judge. Yes, you're asking me. That's what I would tell you. But I agree. That's not expressly in the order. But her order does expressly state, when relating to MasterCard, that during the same period of time, this is in relation to the time that she was receiving maintenance and child support, which was outlined above. Annie has been able to accumulate savings in her separate checking account made up primarily of the child support and the maintenance payment she's received from Erin. So it looks to me as if the trial court did take into effect the fact that she was receiving maintenance and child support, and it appears to me to be almost an offsetting then for the fact that she was able to save some of that. I would agree, and I apologize. I did try this case, but it's been a while ago, and I forgot that. I forgot that she awarded the bank account separately. You are correct. Okay. So she ordered each party to have bank accounts, and he was able to save as well. He had savings. They were not as significant, but he had savings. Yeah. And we don't have to inventory maintenance or child support, right? I mean, if she saves, she saves. She can do whatever she wanted with it, do anything she wanted with it. There's no duty for her to account for that. And that should not be a detriment to her. No, nor should it be. Balancing of the equities. Correct. Nor should it be a detriment to him that he chose to save part of that money in the plan. It would have been the same if he had saved it in the bank account. We probably wouldn't be arguing about that. But he didn't. But she didn't. I mean, if that's the case, then there wouldn't have been an offset of $54,000. He saved it in his MasterCard account. Correct. She saved it in her savings account. Correct. Does it matter? No. To me, no. It doesn't make any difference. Judge Cates, you asked a question in camera. I did. I looked quickly. I can't get my computer to hook to your Internet system. I don't see a reference to an in-camera request anywhere. There was a GAL request. And I think we went, instead of the GAL, Judge Foley appointed Diane Pleasant. That's where we ended up. I thought this was Tamika Purchase. It was. Foley was the original trial judge, was the trial judge at the time of the temporary hearing. The non-evidentiary temporary hearing, Judge Purchase was the judge. In March, I think prior to trial, about three months prior to trial, when there was an evidentiary hearing in which Dr. Pleasant testified, Judge Purchase had that hearing as well. What is the arrangement with Disney today? Do you know? I'm not sure what you mean. Are they exchanging the children at a neutral location still? I can't answer that. I just don't know the answer to that. What I will, if I can make this comment, perhaps I've been at this too long. I handle multiple divorce cases every day. And if you look at the history of the decision-making in this case, until this petition was filed, you've got harmony across the board. These folks made joint decisions. The problem with decision-making in this case didn't start until the divorce was filed. You have Dr. Pleasant, who did recommend sole decision-making in her last report, but in her second report recommended that each of them have sole decision-making with various children. You have to look at the context, as you said. You have to look at all the other factors that exist in the record. My client testified he believed much of this dispute between the two of them related to the divorce filing. This was a contested case. Contested cases are difficult. When you also look at Dr. Pleasant's testimony about sole decision-making to anyone in this case, she admitted that what that would do is exclude the other parent from all effective decision-making. That's what would happen. And couple that with her comment, these are good parents, the comment of all the third-party witnesses she interviewed who said, these are good parents, and her comment specifically about my client being a great parent, flies in the face that there would be sole decision-making in this case. It is certainly going to be difficult, but the parties have a history of doing that. One of the factors the court has to look at is what, how decision-making was handled 24 months prior to the filing of a petition. And there's a reason for that, and I think the reason for that is what you see here today. It's parties can. It's not an excuse, Mr. Portniko, for people to engage in the kind of conduct that's been engaged in by not only your client, but Mr. Keon as a client. Judge, I agree. I agree. It isn't an excuse for anyone to do that, but I think the reason that provision is in the statute is so that trial judges do look at what happened in the past and not necessarily of what's happening during the litigation. I'm not defending the conduct of either one of these parties in this case. It's reprehensible, and I have said that repeatedly. The children should not have been subjected to this. The parties are the ones acting like children, and I absolutely agree, Judge. I'm concerned that the court found no impact or even didn't really consider the mental health of the children in determining best interests in this case. It found it in its order. I found it very interesting that when it came to mental health, it found it not a factor. And yet it seems to be quite a bit of an issue in this case. There's no interview of the children. There is certainly an issue with regard to mental health of all of the individuals involved in this case. I think that's why the – Best interests of the children. Correct, and I believe that's why the judge required the continuation of the counseling post-divorce. That is also in the order. Even that recommendation was oftentimes not followed during the litigation, as I understand. That the children be in counseling? That the parties engage in counseling with the children. Both of the parties testified that they each had counselors. All of the children were in counseling. Lucas, the oldest child, had been out of counseling. Dad got him back into counseling. He refused to go. Dad got him back. So to my recollection, and it could be faulty, I think all of the children were in counseling. At the time of the hearing. At the time of the hearing. And the only one who had not been, my recollection, was Lucas. Lucas got back in. Questions? Thank you. No further questions. Thank you, Mr. Courtney. Mr. Pianto? Your Honor? This is difficult because this act is not a model of clarity. But the citations, we have a couple of paragraphs in our brief. And I have the brief here, but I don't have it paginated. But I'll give you the citations. It's 750, et cetera. Section 503, small c1, capital A, and small c2, capital A. And we've also then cited 503A generally. But A1 says, if marital and non-marital property are commingled by one estate being contributed to the other, filing shall apply, et cetera. If the contributed property loses its identity, the contributed property transmutes to the estate receiving the property subject to the provisions of paragraph 2. And then c says, c2A says, when one estate of property makes a contribution to another estate of property, the contributing estate shall be reimbursed from the estate receiving the contribution, notwithstanding any transmutation. No such reimbursement shall be made with respect to a contribution that is not traceable by clear and convincing evidence, or that it was a gift. And to translate that, you really have to look at the cases. I've cited a couple of cases in that section of our brief. That's the best I can do, is to say. I don't know that that section necessarily pertains, I think, to the retirement portions. No, no, we're not talking about that. We're only talking about component 4, which is the earnings in the commingled account, which is the AT&T account. I think there's no dispute that was commingled because the assets kept changing. It's a commingled account. And so the earnings on that from the non-marital portion that was in the account before marriage, if he wanted those earnings to be treated as non-marital property, he needed to prove by clear and convincing evidence how much they were. And it was his burden, and we don't have to do that. On the plan of responsibility, I think our basic argument is very simple. As to plan of decision-making, these parties are incapable of making joint decisions. And, again, we have to keep coming back to the record. Everything is about the record, of course. I think the record is uncontrovertible on that point. Right now, they're not capable of doing it. As to parenting time, we come back to the report. Mr. Kiyaka, do you know, Mr. Courtney didn't know, but do you know today how things are being exchanged, how the children are being? I do not. I do not, Your Honor. I'm sorry. How do we know the order isn't working? Well, the parties have tried to comply with what the order is, but we don't know if it's working. Of course, the parties can always come back in and ask to have it changed. But I don't know if it's working or not. But as to the parenting time, what other problems you might have with Dr. Pleasant's report, her recommendations of parenting time are consistent with all of her findings, everything, all of the information that she collected, and basically said it's in the psychological interest of the children, and especially the girls, not to have extended parenting time during the week in the school during the school year. If it's not school time, that's different. But during the school year, they shouldn't. So all we're asking is that the parenting time issue be reexamined in light of the unrefuted recommendation of Dr. Pleasant that was not in the children's best interest, the children's psychological and emotional best interests, to have that much of an extended parenting time. Everyone thinks that in the future that may get better, and it may. But as we know, anything can happen, and we don't know. And when it does happen, then the parenting time can be adjusted. Are the parties in the court today? Yes. Well, Amy is here. I don't know about her. She's right here. All right. Questions? No questions. No questions. Thank you. All right. Thank you, Mr. Keefe. Thank you, Mr. Courtney. Thank you for your arguments here today. The matter will be taken under advisement. We'll issue an order in due course.